# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2009-IA-01418-SCT

*MATTIE BENNETT, INDIVIDUALLY AND ON BEHALF OF THE WRONGFUL DEATH BENEFICIARIES OF JOSEPHINE LEWIS, DECEASED AND AS ADMINISTRATRIX OF THE ESTATE OF JOSEPHINE LEWIS, DECEASED*

*v.*

*HILL-BOREN P.C., T. ROBERT HILL, MELVIN & MELVIN AND LEONARD B. MELVIN, III, EXECUTOR OF THE ESTATE OF LEONARD B. MELVIN, JR., DECEASED*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/06/2009 |
| TRIAL JUDGE: | HON. ROBERT G. EVANS |
| COURT FROM WHICH APPEALED: | JONES COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | HIAWATHA NORTHINGTON, II |
| | ALMA WALLS |
| ATTORNEYS FOR APPELLEES: | JOHN BENTON CLARK |
| | THOMAS RAY JULIAN |
| NATURE OF THE CASE: | CIVIL - LEGAL MALPRACTICE |
| DISPOSITION: | REVERSED AND REMANDED - 01/27/2011 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE GRAVES, P.J., DICKINSON AND CHANDLER, JJ.**

**CHANDLER, JUSTICE, FOR THE COURT:**

¶1.     Mattie Bennett filed a legal-malpractice action against Hill-Boren, P.C., T. Robert Hill (collectively, "Hill"), Melvin & Melvin, Leonard B. Melvin, Jr. (collectively, "Melvin"), and John Does 1-10.  Bennett alleged that Hill and Melvin had represented her and her sister,

Dorothy Washington, in a wrongful-death case filed on August 23, 2000, and that Hill and Melvin had failed to serve process on a defendant, which had resulted in the dismissal of the case.

¶2. Melvin moved for summary judgment based on the expiration of the three-year statute of limitations. In response, Bennett asserted that, under the discovery rule, the earliest time that she knew or reasonably should have known of the alleged malpractice was when her new counsel had obtained the case file in 2005. The trial court rejected Bennett's discovery-rule argument, and held that the statute of limitations had begun to run, at the earliest, upon Bennett's termination of Melvin's representation in 2001 or, at the latest, when Melvin last had represented Washington and Bennett, in unsuccessful settlement negotiations in 2002. The trial court granted summary judgment to Melvin, and entered a final judgment in favor of Melvin pursuant to Mississippi Rule of Civil Procedure 54(b). *See* M.R.C.P. 54(b).

¶3. Because Bennett submitted evidence that, under the discovery rule, the earliest time that she or Washington knew or with reasonable diligence should have known of the alleged malpractice was when her new counsel had obtained the case file in 2005, there was a genuine issue of material fact as to the date that she or Washington knew or should have known about the alleged negligence. Therefore, this Court reverses the trial court's order granting summary judgment to Melvin. We remand this case for further proceedings.

**FACTS**

I.     **The Underlying Medical-Malpractice Case**

¶4. Quitman County Nursing Home admitted Bennett and Washington's mother, Josephine Lewis, in approximately 1996. Lewis developed gangrene in her left foot, and she

2

was admitted to Northwest Mississippi Regional Medical Center (NMRMC) for amputation of the foot on July 23, 1998. NMRMC discharged Lewis on August 3, 1998. Upon Lewis's return to the nursing home, a nurse discovered a large decubitus ulcer covering ninety percent of Lewis's buttocks. Lewis was admitted to the Regional Medical Center in Memphis for treatment of the decubitis ulcer and for amputation of her left stump due to further gangrene problems. Lewis's condition deteriorated, and she was transferred to an extended-care, skilled nursing facility on August 29, 1998. Lewis died from an infection in her bloodstream the next day.

¶5.    Washington consulted Hill on the matter and, shortly thereafter, Hill hired Melvin as Mississippi counsel. Melvin received a letter from Dr. Carl A. Coppolino dated May 24, 1999, and a letter from Dr. Alan E. Kravitz dated August 13, 1999, that provided expert medical opinions that only NMRMC was negligent. Both physicians stated that Lewis had died from a blood infection caused by the decubitus ulcer. Both also stated that NMRMC was negligent because it had both caused the ulcer and failed to treat it. Dr. Kravitz stated that he found no negligence on behalf of Quitman County Nursing Home.

¶6.    On August 23, 2000, Hill and Melvin filed a complaint on behalf of Washington and the other wrongful-death beneficiaries in the Circuit Court of Quitman County against the Quitman County Hospital and Nursing Home, Inc., and NMRMC, under the lease, operation, and management of Health Management Association, Inc., seeking $2,000,000 in actual damages and $5,000,000 in punitive damages. Melvin caused summonses to be issued for both defendants. An August 30, 2000, letter from the process server, CT Corporation, to Melvin reflects that the CT Corporation returned the NMRMC summons as faulty. Neither

3

Melvin nor Hill again attempted to effect service. On November 12, 2001, Hill sent a letter to Melvin stating that Washington had insisted she terminate Melvin's representation due to a prior confrontation between Melvin and Washington. The letter requested return of Melvin's file. Melvin sent Hill letters acknowledging the termination on November 14, 2001, and November 16, 2001. However, Melvin did not file a motion in the trial court for permission to withdraw. The trial court dismissed the case for want of prosecution on October 14, 2005. Because Melvin never had withdrawn from the case, Hill moved for permission to withdraw for himself and Melvin on October 13, 2005, the day before the case was dismissed for want of prosecution.

## II. The Instant Legal-Malpractice Case

¶7. The alleged legal malpractice arose from Melvin's failure to effect service of process on NMRMC. Melvin's file contained a legal-research memorandum dated August 28, 2000, on excusable neglect, the standard for obtaining an order enlarging the time for service of process. *See* M.R.C.P. 6(b). However, neither he nor Hill ever sought the issuance of an alias summons or sought leave from the court for additional time to effect service of process. Melvin received a letter from NMRMC's insurance carrier dated February 3, 2002. Although Melvin had been terminated, he responded on February 12, 2002, seeking settlement.

¶8. Hill hired new Mississippi counsel, Lucius Edwards. Upon Hill's review of the entire file and discussion with Edwards, Hill discovered that NMRMC had not been served and that this omission likely was fatal to the case against NMRMC. Hill wrote the following note on or about December 28, 2001:

This is a curious bunch of documents. Where is copy of complaint? Answer? For N.H.? I think the regional medical center is <u>gone</u> for failure to serve summons timely. See ltrs. to LM + client. Set depositions. Serve rogs. Do we have all documents? RFProduction? What a mess. [s/]R.

In a January 2, 2002, letter to Melvin, Hill stated:

I am very concerned about the lawsuit against the hospital (Northwest Mississippi Regional). *It appears that you never obtained service on the defendants Northwest Regional and Health Managment Association, Inc. (management company of the hospital), and time has expired to issue alias summons. This situation has been explained to Ms. Washington.* I am not sure what damage has resulted from this error but I would suggest that you consider notifying your malpractice carrier of a potential claim.

If you have information that would establish good service on Northwest Regional and Health Management, please let me have it as soon as possible. Time is of the essence.

(Emphasis added.)

¶9.    Notwithstanding this letter, in their interrogatory responses, both Hill and Melvin admitted that they never had informed Bennett or Washington of the failure to serve NMRMC. In Bennett's interrogatory answers, she stated that on or about March 19, 2001, Melvin had informed Washington that they were "having trouble" obtaining service of process on one of the defendants. She further admitted that, on or prior to January 2, 2002, Hill had informed Washington "about the difficulty of obtaining service of process upon the defendant [NMRMC]." Notably, Bennett's responses did not state that Washington had been told that the time had expired for service of process, as asserted in Hill's letter to Melvin.

¶10.    The correspondence between Washington and Bennett and Hill reveals that the sisters repeatedly inquired about the status of the case through written correspondence and telephone calls. In a September 25, 2002, letter to Hill, Washington and Bennett complained

5

that they had received little or no communication from their attorneys. They stated that they had been told that Dr. Kravitz had been gathering information, and that they should expect to go to court in spring 2002. In an April 8, 2003, letter, Hill informed the sisters that the case was in the discovery phase, including sending pleadings to the defendants and answering pleadings, and they were working hard to move everything along. But a May 3, 2004, letter from Hill to Washington stated that, upon review, Hill had concluded that the case could not be won because there was no way to prove negligence on behalf of the nursing home, and recommended dismissal. In a November 24, 2004, letter, Hill apologized for all the delays in the case. At no point in the correspondence did Hill address the failure to serve NMRMC. On or about April 4, 2005, Washington retained new counsel who commenced the instant legal-malpractice action, which was filed on October 22, 2007.

¶11. Bennett filed an amended complaint on November 15, 2007.[1] Melvin moved for summary judgment based on the expiration of the three-year statute of limitations. In response, Bennett asserted that, under the discovery rule, the earliest time that she knew or reasonably should have known of the alleged malpractice was when her new counsel had obtained the case file in 2005. The trial court held that the statute of limitations had begun to run either when Bennett had terminated Melvin's representation in 2001 or when Melvin had last represented Washington in unsuccessful settlement negotiations in 2002. The trial court granted Melvin's motion for summary judgment and entered a final judgment in favor of Melvin under Mississippi Rule of Civil Procedure 54(b). *See* M.R.C.P. 54(b).

---

[1] Washington passed away between the time of the filing of the complaint and the amended complaint.

## STANDARD OF REVIEW

¶12.    This Court applies de novo review to the grant of summary judgment. *Fletcher v. Lyles*, 999 So. 2d 1271, 1276 (Miss. 2009). When reviewing the evidence on summary judgment, the Court should view the evidence in the light most favorable to the nonmovant. *Id.* Viewing the evidence in this light, summary judgment should be granted when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. M.R.C.P. 56(c). The moving party bears the burden of showing that no genuine issue of material fact exists. *Van v. Grand Casinos of Miss., Inc.*, 767 So. 2d 1014, 1017 (Miss. 2000). "The non-moving party must produce specific facts showing that there is a genuine material issue for trial." *Id.* at 1018. The nonmoving party is given the benefit of every reasonable doubt as to the existence of a genuine issue of material fact. *Id.* at 1017. The de novo standard also applies on review of the trial court's application of the statute of limitations. *Fletcher*, 999 So. 2d at 1276.

## DISCUSSION

¶13.    The three-year statute of limitations applies to actions for legal malpractice. *Channel v. Loyacono*, 954 So. 2d 415, 420 (Miss. 2007); Miss. Code Ann. § 15-1-49 (Rev. 2003). The trial court found there was no genuine issue of material fact because more than three years had passed since either of two possible dates when Melvin was terminated, either in 2001 or 2002. Citing *Stevens v. Lake*, 615 So. 2d 1177 (Miss. 1993), Melvin argues that the trial court's decision was correct because the "statute of limitations in a legal malpractice action begins to run on the date that the attorney's representation of the specific matter or

7

transaction ended." This rule for determining the beginning of the limitations period is known as "the continuous representation rule." *Channel*, 954 So. 2d at 420.

¶14. Melvin's contention is without merit. This Court specifically has held that "Mississippi does not follow the 'continuous representation rule.'" *Id.* at 421. In *Channel*, the Court recognized that *Stevens* had discussed the rule, but that the discussion merely had explained the rule and had stated why it could not apply under the facts of the case. *Id.* at 420-21. The Court recognized that, "[i]n *Sneed*, this Court explained that the discovery rule was the proper test for deciding when the statute of limitations for a legal malpractice action begins to run." *Id.* (citing *Smith v. Sneed*, 638 So. 2d 1252, 1253 (Miss. 1994)).

¶15. Under the discovery rule, as applied in a legal-malpractice action, the statute of limitations begins to run on the date that the plaintiff learns, or through reasonable diligence, should have learned, of the negligence of the lawyer. *Sneed*, 638 So. 2d at 1253. The discovery rule is applied when the facts indicate that "it is unrealistic to expect a layman to perceive the injury at the time of the wrongful act." *McCain v. Memphis Hardwood Flooring Co.*, 725 So. 2d 788, 794 (Miss. 1998) (overruled on other grounds). In *Sneed*, the Court found that the discovery rule applies when it would be impractical to require a layperson to have discovered the malpractice at the time it happened. *Id.* at 1257-58. This is because requiring a layperson to ascertain legal malpractice at the time it occurs would necessitate the retention of a second attorney to review the work of the first. *Id.* (citing *Neel v. Magana, Olney, Levy, Cathcart & Gelfand*, 491 P.2d 421, 428 (Cal. 1971)).

¶16. Melvin also cites *Champluvier v. Beck*, 909 So. 2d 1061, 1063 (Miss. 2004), for his assertion that the continuous-representation rule, not the discovery rule, applies. But in

8

*Champluvier*, this Court also applied the discovery rule. The Court examined the following facts that pertained to when Champluvier knew of her attorney's alleged negligence. The trial court had entered a preliminary injunction that had required Champluvier to provide an accounting and turn over business records. *Id.* at 1062. She hired attorney Beck to represent her and provide the court with the accounting. *Id.* However, Beck did not file a proper accounting with the court, and Champluvier was found in contempt and ordered to serve jail time. *Id.* When Champluvier was released, she terminated Beck's representation and filed a bar complaint on September 1, 1999. *Id.* The trial court entered an order releasing Beck from the representation on August 22, 2000. *Id.* Champluvier filed her complaint on March 14, 2003. *Id.* Champluvier argued that her complaint was timely because she had filed the complaint within three years of the date the court had entered the order terminating Beck's representation. *Id.* at 1063.

¶17. The Court held that the statute of limitations had run by the time Champluvier had filed the complaint. *Id.* at 1064. The Court stated, "[t]he statute of limitations in a legal malpractice action properly begins to run on the date the client learns or through the exercise of reasonable diligence should learn of the negligence of his lawyer." *Id.* at 1063 (quoting *Greenline Equip. Co. v. Covington County Bank*, 873 So. 2d 950, 956 (Miss. 2002). The Court rejected Champluvier's argument that the limitations period ran from the date of termination. *Id.* The Court stated that, in *Stevens*, the Court had held that the attorney's continuing representation of the client on other matters did not toll the statute of limitations for legal malpractice. *Id.* (citing *Stevens*, 615 So. 2d at 1182). The Court held that Champluvier reasonably knew or should have known of Beck's negligence a year before the

9

court order of termination, because in August 1999, she had been held in contempt of court and jailed for Beck's mistakes, and in September 1999 she had filed a bar complaint against Beck. *Id.* at 1063-64.

¶18. Melvin also argues that, under the rules of agency, Melvin's and Hill's knowledge of the failure to serve NMRMC was imputed to Washington and Bennett. However, the cases Melvin cites for this proposition are inapposite, because they do not involve a lawsuit against an attorney by a former client for legal malpractice. Instead, these cases held that an attorney's knowledge was imputable to the client where the rights of third parties were involved. *O.W.O. Investments, Inc. v. Stone Inv. Co.*, 32 So. 3d 439, 447 (Miss. 2010); *Lane v. Oustalet*, 873 So. 2d 92, 95-6 (Miss. 2004). The essence of a legal-malpractice action is that the attorney's and the client's interests are opposed to each other, and the discovery rule could never apply in legal-malpractice cases if an attorney's knowledge of his or her own misconduct was imputed to the client. Plainly, Bennett presented evidence that Melvin and Hill had acted in their own interest by failing to communicate the lack of service of process on NMRMC. Thus, we find the agency principle Melvin cites to be wholly inapplicable to the instant case.

¶19. We find that the evidence submitted on summary judgment created a genuine issue of material fact as to whether the first time that Bennett and Washington knew or with reasonable diligence should have known of the alleged malpractice was when their new attorney received the case file in 2005. In the January 2002 letter to Melvin, Hill stated that he had informed Washington that the time had expired to serve NMRMC. However, Bennett claimed that neither she nor Washington had known of the fatal error until they had obtained

10

the case file from Hill and had it reviewed by new counsel. In fact, both Hill and Melvin admitted in their interrogatory responses that they never had informed Bennett or Washington of the failure to serve NMRMC. Bennett admitted in her interrogatory responses that on March 19, 2001, Melvin had informed Washington that they were having trouble serving process on one of the defendants, and that prior to January 2, 2002, Hill had informed Washington about the difficulty of serving process on NMRMC. Viewing the evidence in the light most favorable to Bennett, Bennett presented evidence that she and Washington had lacked actual knowledge of the alleged malpractice prior to her new counsel's review of the case file in 2005.

¶20. Melvin argues that, when Bennett and Washington were told that their attorneys were having trouble with service on NMRMC, a duty to investigate arose, and their failure to investigate was a lack of reasonable diligence. Citing *Blailock ex rel. Blailock v. Hubbs*, 919 So. 2d 126, 130 (Miss. 2005), and *Spann v. Diaz*, 987 So. 2d 443 (Miss. 2008), Melvin argues that, in order to fulfill the reasonable-diligence requirement, Bennett and Washington were required to investigate the available records, such as court records and client files, in an effort to ascertain whether malpractice had occurred. "[T]o claim benefit of the discovery rule, a plaintiff must be reasonably diligent in investigating the circumstances surrounding the injury." *Wayne Gen. Hosp. v. Hayes*, 868 So. 2d 997, 1001 (Miss. 2004). "The discovery rule will toll the statute of limitations 'until a plaintiff should have reasonably known of some negligent conduct, even if the plaintiff does not know with absolute certainty that the conduct was legally negligent.'" *Blailock*, 919 So. 2d at 130 (citing *Wayne Gen. Hosp.*, 868 So. 2d at 1000-01).

11

¶21.   *Blailock* was a medical-malpractice action in which the plaintiffs sued the doctors who had delivered their son. *Id.* at 129. After the expiration of the one-year statute of limitations under the Mississippi Tort Claims Act, the plaintiffs sought to amend their complaint to join the hospital. *Id.* This Court held that the one-year statute of limitations had expired because the Blailocks had been on constructive notice of possible medical negligence since the birth; they had possessed medical records indicating negligence on behalf of the hospital as well as the physicians, and they had in fact instigated the lawsuit against the physicians. *Id.* at 130. The Court held that reasonable diligence required the Blailocks to have reviewed the medical records and determined the hospital's negligence at that time. *Id.* Thus, the plaintiffs had known or should have known of possible negligent conduct by the hospital as early as the delivery of their child or upon their review of the medical records.

¶22.   *Spann* involved an underlying medical-malpractice case where the plaintiff's attorney, Diaz, had added Dr. Rawson as a defendant after the statute of limitations had expired. *Spann*, 987 So. 2d at 445. The plaintiff settled with the hospital, and a jury rendered a verdict for the plaintiff against Dr. Rawson. *Id.* On appeal, this Court reversed the plaintiff's verdict based on the statute of limitations. *Id.* (citing *Rawson v. Jones*, 816 So. 2d 367 (Miss. 2001)). After speaking to another attorney, Spann learned that Diaz had been negligent in failing to timely join Rawson. *Id.* This Court found that Spann's legal-malpractice suit was time-barred because the legal negligence was a matter of public record, and in the exercise of reasonable diligence, Spann should have discovered Diaz's negligence at the time this Court denied Spann's motion for rehearing of the decision barring her suit against Rawson. *Id.* at 449-50. The Court noted that the *Rawson* decision specifically stated

12

the reasons for finding that the statute of limitations had expired and strongly implied that Diaz had been at fault. *Id.* at 449.

¶23.    *Blailock* and *Spann* are distinguishable from the instant case.  Although Washington and Bennett could have checked the court records to determine whether NMRMC had ever been served, they had received no information that should have alerted a layperson to possible negligence.  The news that their attorneys were having trouble or difficulty with serving NMRMC was not the type of information reasonably guaranteed to communicate to a layperson that the reason for the difficulty was that their attorneys may have been guilty of negligence.  In fact, Bennett and Washington submitted evidence showing that they had exercised reasonable diligence by continually inquiring into how the case was progressing through their telephone calls and written correspondence to Hill.  But instead of informing the sisters of the fact that the case could not proceed against NMRMC, Hill's responses contributed to a false sense of security by continually reassuring them that things were progressing, until finally informing them that the case could not proceed because there was no evidence of negligence on behalf of the nursing home.

¶24.    Quoting the Texas Supreme Court, this Court has stated that the "[c]orollary to [an attorney's] expertise is the inability of the layman to detect its misapplication; the client may not recognize the negligence of the professional when he sees it." *Smith,* 638 So. 2d at 1257. (quoting *Willis v. Maverick*, 760 S.W.2d 642, 645-46 (Tex. 1988)).  This Court further quoted:

> The client must feel free to rely on his attorney's advice.  Facts which might ordinarily require investigation likely may not excite suspicion where a fiduciary relationship is involved.  Further, breach of the duty to disclose is

tantamount to concealment. Thus, the California Supreme Court writes: "[p]ostponement of accrual of the cause of action until the client discovers, or should discover, the material facts in issue vindicates the fiduciary duty of full disclosure; it prevents the fiduciary from obtaining immunity for an initial breach of duty by a subsequent breach of the obligation of disclosure."

*Id.* By adopting this rule of law, this Court has determined that Mississippi attorneys cannot rely on their failure to fully inform their clients to assert the statute of limitations in a legal-malpractice action. We find that the evidence created a genuine issue of material fact concerning when Washington and Bennett knew or should have known that Melvin was guilty of the alleged malpractice.

¶25. Bennett alternatively argues that the statute of limitations was tolled because the evidence tended to show that Melvin fraudulently had concealed both the failed service and the fact that it was fatal to the wrongful-death case. The requirements to show fraudulent concealment of a cause of action are (1) a subsequent affirmative act of concealment, and (2) due diligence. *Andrus v. Ellis*, 887 So. 2d 175, 181 (Miss. 2004); Miss. Code Ann. § 15-1-67 (Rev. 2003). The fiduciary relationship that exists between attorney and client creates a duty of disclosure. *Waggoner v. Williamson*, 8 So. 3d 147, 154 (Miss. 2009) (quoting *Owen v. Pringle*, 621 So. 2d 668, 671 (Miss. 1993)). When a fiduciary relationship exists, the failure to disclose can be an affirmative act. *See Poe v. Summers*, 11 So. 3d 129, 134 (Miss. Ct. App. 2009).

¶26. Although Washington terminated Melvin in November 2001, by law, Melvin represented Washington and Bennett until he was properly relieved by a court of record. *Myers v. Miss. State Bar*, 480 So. 2d 1080, 1092 (Miss. 1985) (stating that "any time an attorney undertakes to represent a client in any court of record in this state . . . there attaches

14

at that moment a legal, ethical, professional and moral obligation to continue with that representation until . . . properly relieved by the court of record"). Because Melvin had a fiduciary relationship with the sisters, he had a duty to communicate facts material to the litigation for the duration of the representation.

¶27. Bennett contends that Melvin's concealment of the failure of service and the resulting fatality to the wrongful-death case was tantamount to an affirmative act of concealment. Hill's January 2, 2002, letter to Melvin communicated that Hill had explained the failure of service to Washington. It is reasonable to infer that Melvin reasonably relied on this representation from cocounsel and believed the situation had been "explained to Washington." However, there is no evidence that, at any time between August 30, 2000, when Melvin received notice of the failed service, and January 2, 2002, Melvin took any measures to inform his clients of the failure. As discussed above, there was evidence that the sisters were diligent in keeping abreast of developments in the litigation through repeated inquiries into the progress of the case. We find that there is a genuine issue of material fact as to whether fraudulent concealment by Melvin tolled the statute of limitations.

## CONCLUSION

¶28. The Court finds that, viewing the evidence in the light most favorable to Bennett, there was a genuine issue of material fact as to when Bennett and Washington knew, or in the exercise of reasonable diligence should have known, of the alleged legal negligence. We further find that there were genuine issues of material fact concerning possible fraudulent concealment. Accordingly, we reverse the trial court's order granting summary judgment to Melvin and remand this case for further proceedings.

15

¶29.   **REVERSED AND REMANDED.**

**WALLER, C.J., CARLSON AND GRAVES, P.JJ., DICKINSON, LAMAR, KITCHENS AND PIERCE, JJ., CONCUR. RANDOLPH, J., NOT PARTICIPATING.**